# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| EMMA MCCASTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 12 C 4059 |
| v. ) | |
| ) | Magistrate Judge |
| CAROLYN W. COLVIN,[1] ) | Mary M. Rowland |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Emma McCaster filed this action seeking review of the final decision of Defendant Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. 42 U.S.C. §§ 416(i), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Plaintiff has filed a motion for summary judgment requesting the Court to reverse the Commissioner's decision. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Social Security Act.[2] *See Elder v. Astrue*, 529 F.3d 408,

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 25(d).

409–410 (7th Cir. 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1.     Is the claimant presently unemployed?

2.     Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least twelve months?

3.     Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4.     Is the claimant unable to perform his or her former occupation?

5.     Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). The claimant

---

[2] The regulations governing the determination of disability are set forth at 20 C.F.R. §§ 416.901–999d for SSI and at 20 C.F.R. §§ 404.1501–404.1599 for DIB. In the interest of convenience, the Court mostly cites to the SSI regulations. The standards for determining DIB and SSI are virtually identical. *See Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

bears the burden of proof through Step 4, but at Step 5 the burden shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Emma McCaster applied for period of disability, DIB, and SSI on December 11, 2008, alleging that she became disabled on December 27, 2007. (R. at 9; Dkt. 20 at 1; Dkt. 27 at 1.) This application was denied initially on March 5, 2009 and, upon reconsideration, on September 16, 2009. (R. at 9, 43, 50.) Subsequently, on October 27, 2009, McCaster filed a timely request for a hearing. (R. at 9.) An Administrative Law Judge ("ALJ") conducted the hearing on July 12, 2010, during which McCaster appeared and testified without the assistance of counsel. (R. at 9, 20–38).)

On January 6, 2011, the ALJ denied McCaster's request for period of disability, DIB, and SSI. (R. at 16.) The ALJ initially determined that McCaster met the insured status requirements of the Social Security Act through December 31, 2012. (R. at 11.) The ALJ then engaged in the five-step sequential evaluation process, finding, at Step 1, that McCaster had not engaged in substantial gainful activity since December 27, 2007, the alleged onset date. (*Id.*) Then, at Step 2, the ALJ found that McCaster had the severe impairments of status post left ankle fracture, status post Achilles tendon repair surgery, and obesity. (*Id.*) At Step 3, the ALJ determined that McCaster did not have an impairment or combination of impairments that met or medically equaled one of the listings enumerated in the regulations. (R. at 12.)

The ALJ then assessed McCaster's residual functional capacity ("RFC"), determining that she had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b). (R. at 12.) The ALJ stated:

> [McCaster had the] abilities (*sic*) to lift and carry up to 10 pounds frequently and 20 pounds occasionally, to sit for 6 hours in an 8-hour workday, and to stand and walk each for 6 hours in an 8-hour workday—except with the following additional limitations:
> -     Can never climb ladders; and
> -     Can only occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl.

(*Id.*) At Step 4, the ALJ determined that McCaster was capable of performing her past relevant work as a phlebotomist. (R. at 15.) Accordingly, the ALJ concluded that McCaster was not disabled, as defined by the Social Security Act, from December 27, 2007 through the date of the decision. (R. at 16.)

On April 18, 2012, the Appeals Council denied McCaster's request for review. (R. at 1–5.) McCaster now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (*Id.*) *See, e.g.*, *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by section 205(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment

for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal quotations and citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002 (internal quotations and citation omitted). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

# IV. RELEVANT MEDICAL AND VOCATIONAL EVIDENCE

## A. Personal and Vocational Background

McCaster was born on April 23, 1954 and was 56 years old at the time of the hearing. (R. at 26.) She stood 5'3" tall and weighed approximately 230 pounds. (R. at 26–27.) She completed three years of college. (R. at 118.) As of the hearing date, McCaster was single, had no minor children, and lived alone in her house. (R. at 27.)

As for McCaster's vocational history, she worked as phlebotomist between 1988 and 2007 and also carried out duties of a respiratory and an electrocardiogram ("EKG") technician. (R. at 16, 120–22.) According to McCaster, specific duties entailed drawing blood, administering EKGs and respiratory treatments, prepping IVs, and answering emergency calls to assist doctors. (R. at 114.) Her workday typically involved spending several hours reaching, walking, standing, writing/typing/handling small objects, and handling/grabbing/grasping big objects. (R. at 114, 121.) McCaster also suggested that she spent at least one hour each day sitting, stooping, kneeling, and crouching. (*Id.*) Although she said that "lifting and carrying" was not part of her job, (R. at 114.), she also stated that she "frequently" lifted ten or fewer pounds. (R. at 114, 121.)

McCaster allegedly became unable to work on December 27, 2007. (R. at 28, 113.) Her purported disability primarily resulted from two problems involving her left foot: (1) Achilles tendonitis; and (2) a subsequently incurred fracture to her left ankle. (R. at 112.) Symptoms included cramping, swelling, and difficulty with

standing and walking. (R. at 112, 143, 154.) As a result, she utilized a variety of assistive devices. (R. at 129, 133, 143.)

## B. Medical Evidence

### *Pre-hearing Medical Evidence*

On July 5, 2007, McCaster was examined by Dr. Carlos Smith. (R. at 196.) McCaster complained of left heel pain and soreness, which was exacerbated by either walking for a short period of time or standing for an extended period of time. (*Id.*) However, her condition could be relieved by sitting down or resting. (*Id.*)

On August 29, 2007, a musculoskeletal exam revealed areas of "quite apparent" spurring and lipping. (R. at 194.) These areas were "tender to touch and indicative of arthritic processes, causing degradation of the joints." (*Id.*) The exam also noted a decreased range of motion in McCaster's left ankle. An MRI of the relevant area proved to be "positive." (*Id.*) As a result, Dr. Smith diagnosed McCaster with Achilles tendonitis and opined that "surgery [wa]s required." (*Id.*) On December 12, 2007, Dr. Smith reiterated his recommendation for surgery, (R. at 193.), and McCaster underwent the "Achilles tendon repair exostectomy" on January 3, 2008. (R. at 175.).

On February 7, 2008, McCaster had a follow-up appointment with Dr. Smith. (R. at 190.) Dr. Smith found that McCaster was doing "well at the post-operative site" and that the "pain with movement and position at the surgical site [wa]s as expected." (*Id.*) The doctor also stated that McCaster had no problems with

ambulation and that, overall, she "should continue to heal normally, barring any injury or accidents." (*Id.*)

In March 2008, Dr. George Holmes determined that McCaster would be able to reach "maximum medical improvement" within approximately one month of March 20, 2008. (R. at 170–72.) However, on March 31, 2008, McCaster reported to her therapist (1) that her left foot felt "different" from her right; (2) that her left leg was fatigued; and (3) that she had been limping more. (R. at 166.) However, she also stated that she did not have any additional problems with her balance. (*Id.*)

As of April 16, 2008, McCaster was progressing with respect to her range of motion and gait. (R. at 167.) Nevertheless, it was noted that McCaster was "not yet ready to return to full duty due to the quantity of walking . . . ." (*Id.*) McCaster did "return[]" to *light* duty work on April 22, 2008. (R. at 170.) In June 2008, she was released to full duty, (R. at 171, 184.), and, on July 30, Dr. Smith noted that McCaster's activity had not been limited by the effects of her surgery, (R. at 183.).

Several months later, on September 10, 2008, McCaster once more had a follow-up appointment with Dr. Smith. (R. at 181.) At the time, her primary complaint was of soreness in her left heel. (*Id.*) Dr. Smith noted that, although McCaster displayed indications of "equinus deformity," she was doing "well at the post-operative site" and her pain was as "expected." (*Id.*) She also had no problems with ambulation. (*Id.*) In sum, Dr. Smith again anticipated that McCaster would have a "normal recovery, barring any injury or accidents." (*Id.*)

On October 16, 2008, Dr. Holmes examined McCaster and determined that her Achilles tendon surgery had been successful and that she had reached maximum medical improvement. (R. at 171–72.) Further, he stated that she had "no limitations" at the time and "should be able to perform the requirements of her previous employment." (R. at 172.)

However, McCaster fell down in December 2008, fracturing—and again injuring—her left ankle. (R. 197.) On December 7, she saw Dr. Mark Nitekman at Advocate Christ Medical Center. (R. at 197–99.) Dr. Nitekman determined that McCaster had suffered a "bimalleolar fracture with marked disruption of the ankle mortise" and that her "talus [was] displaced laterally in relation to the tibia." (R. at 197–99, 213.)

McCaster subsequently had "ORIF" surgery on her left ankle. (R. at 271.) On March 5, 2009, she was seen by Dr. Alex Romero, who indicated that McCaster was doing "well" following the surgery and that she was being transitioned out of her "Cam boot." (*Id.*) Moreover, at the appointment, McCaster denied having significant left ankle pain, swelling, numbness, tingling, or loss of sensation. (*Id.*) Nevertheless, on April 16, doctors recommended that McCaster wear a compression stocking to help alleviate swelling and that she use a cane to assist with walking. (R. at 272.)

An x-ray conducted on July 16, 2009 showed "good alignment" of the ankle joint but also "diffuse soft tissue swelling" around the ankle. (R. at 231.) Several months later, at a March 9, 2010 appointment, McCaster was noted for having a left-sided limp. (R. at 252.)

### *McCaster's Hearing Testimony*

Prior to commencing the hearing, the ALJ provided an opening statement, where he directly addressed McCaster. (R. at 22.) He first discussed McCaster's lack of representation:

> Now, first thing we do in these hearings is talk about the right to representation, how to find a representative, how to pay for a representative. And then after we're done with that you'll decide whether you want to waive your right to representation, do your hearing today, or if you wish to reschedule by that time getting a representative, having enough time to do that. . . .

(*Id.*)

The ALJ then gave McCaster papers that provided information on several legal aid organizations and described the various attorney fee structures. (R. at 22–23.) After relaying this information to McCaster, the ALJ asked if she wished to proceed through the hearing without representation. (R. at 23.) McCaster answered that she wished to "[p]roceed through the hearing." (*Id.*)

Later, the ALJ asked McCaster whether she had looked at a computer disk containing all of the evidence the ALJ had on the case (R. at 22–24.) McCaster responded that, although she had not yet looked at the evidence, she would. (R. at 24.)

After testimony commenced, McCaster stated that she first injured her left Achilles tendon in June 2007. (R. at 29.) By December, the injury had caused her to stop working. (*Id.*) Given the choice of either going to work or having surgery, McCaster chose the latter, which she ultimately underwent on January 3, 2008. (*Id.*)

By March 2008, her condition had apparently improved, and she was "released to light duty" in April. (R. at 30, 32–33.) She continued to experience pain but attempted to return to her old employer. (*Id*). However, she was informed that she had been terminated, and she did not actually perform any work. (*Id*.) After her doctor released her to full duty in "July," McCaster began applying for other jobs. (*Id*.)[3]

Additionally, McCaster described the December 7, 2008 fracture to her left ankle. (R. at 30.) She said that she had been descending her stairs at home "one step at a time," when she fell down to the bottom of the stairs. (R. at 31.) McCaster explained that she was not entirely sure why she fell, (*Id*.), but stated that the fracture was somehow connected to her earlier left Achilles tendon problem. (R. at 30.) In her own words, the "fracture happened right across the ankle," and she was in "a lot of pain." (R. at 31–32.) She underwent ankle surgery on December 24, 2008 and subsequently wore a cast with seven screws and one plate. (R. at 32.)

McCaster testified that, as of the hearing date, the fracture had not yet healed, and it continued to be a problem for her. (R. at 30.) She had the symptoms of swelling and pulling, in addition to a sharp, sticking pain. (R. at 33.) She had a prescription for Vicodin and Percocet, and she took pain medication for her ankle "[m]ostly every day." (R. at 34.) She also said that applying ice to her ankle helped ease her pain. (*Id*.) McCaster said that she did not have a doctor because she had no health insurance when she fell. (R. at 33.)

---

[3] McCaster's testimony is unclear concerning her return to work and her release to light/full duty. However, according to her medical records, McCaster was released to light duty work in April 2008 and full duty work in June 2008. (R. at 170, 184.)

McCaster testified that her pain ranked a "3" or "4" on a 10-point scale while watching television.[4] (R. at 34–35.) Her pain increased whenever she did "a lot of walking" or "moving around," such as when she went to grocery stores, shopped, or cleaned. (R. at 35.) She said that she needed to go to at least three or four different stores in order to budget her money. (*Id.*) Her pain ranked a "6" on the 10-point scale after walking around for three hours and ranked a "10" later on when she would lie down in bed. (*Id.*) As a result, she would be "up all night with it." (R. at 36.)

In addition, McCaster revealed that, since her termination, her "pseudotumor cerebral" had "acted up" due to stress. (*Id.*) As a result, she suffered from migraines and sore feet. (*Id.*) She had received care from a neurologist and took the antidepressant "Amitriptyline." (R. at 37.)

McCaster testified that she had some difficulties driving. (R. at 27.) She stated that these difficulties were due to her migraine headaches and hampered vision and equilibrium. (R. at 28.)

### *Consultative Evidence*

On March 3, 2009, Dr. Frank Jimenez, a Disability Determination Services ("DDS") consultant, completed a physical RFC assessment of McCaster. (R. at 218–25.) Jimenez opined that McCaster was limited in that she could occasionally lift only 20 pounds, frequently lift only 10 pounds, and stand/walk for a total of about 6 hours in an 8-hour workday. (R. at 219.) Furthermore, Dr. Jimenez found that

---

[4] The ALJ specified that a "10" on his scale corresponded to extreme pain, whereas a "0" corresponded to no pain. (R. at 34.)

McCaster could sit for a total of 6 hours in an 8-hour workday and that she had an "unlimited" ability to push/pull. (*Id.*)

Moreover, McCaster could only occasionally climb ramps or stairs and could never climb ladders, ropes, or scaffolds. (R. at 220.) She could only occasionally balance, stoop, kneel, crouch, or crawl. (*Id.*) Dr. Jimenez stated that, even as of December 7, 2009, McCaster should still "avoid frequent postural activities and climbing." (*Id.*) Dr. Jimenez also stated that McCaster should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and "hazards." (R. at 222.) The doctor recommended that McCaster avoid dust and fumes *after* December 9, 2009, due to her "history of asthma." (*Id.*) Dr. Jimenez noted, however, that McCaster had no manipulative, visual, or communicative limitations. (R. at 221–22.)

Dr. Jimenez found McCaster's allegations about the severity of her symptoms and their impact on function to be consistent with the evidence. (R. at 223.) Jimenez added that McCaster was credible and that her "symptoms and alleged functional limitations ha[d] been consistently described throughout the case record." (R. at 225.) However, Dr. Jimenez also opined that her disabling condition would "improve." (*Id.*)

On September 12, 2009, Dr. David Bitzer affirmed Dr. Jimenez' March 5 RFC assessment. (R. at 264–66.)

## V. DISCUSSION

McCaster raises the following four arguments in support of her request for reversal or remand: (1) the ALJ failed to obtain a valid waiver of McCaster's right to representation; (2) the ALJ failed to develop a full and fair record; (3) substantial evidence does not support the ALJ's determination that McCaster could return to her past relevant work; and (4) the ALJ failed to properly analyze McCaster's obesity. (Dkt. 20.)

### A. Waiver of McCaster's Right to Representation

First, McCaster argues that the ALJ failed to obtain a valid waiver of her right to representation. (Dkt. 20 at 5.) A claimant has a statutory right to be represented by counsel at a disability hearing. 42 U.S.C. § 406; 20 C.F.R. §§ 404.1700, 416.1500; *see Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). However, a claimant may also waive this right. *Binion*, 13 F.3d at 245. For the waiver to be valid, the ALJ must inform the *pro se* claimant of (1) the manner in which an attorney can aid in the proceedings; (2) the possibility of free counsel or a contingency arrangement; and (3) the limitation on attorney fees to 25 percent of past-due benefits and required court approval of the fees. *Id.*; **see Thompson v. Sullivan**, 933 F.2d 581, 584 (7th Cir.1991).

In this case, the ALJ did not address all three of these "*Thompson* factors." The ALJ did discuss at length the possibility of McCaster obtaining free counsel and the 25 percent limitation on attorney fees. (R. at 22–23.) However, the ALJ said

nothing about the manner in which an attorney could aid McCaster in the proceedings. Accordingly, the ALJ failed to obtain a valid waiver of representation.

Prior to the hearing, McCaster was given detailed *written* information that addressed what an attorney could do for her. (R. at 67, 70–72.) But in the Seventh Circuit, it is unclear whether such types of written materials can replace the oral admonishment. *See Gatewood ex rel. D.P. v. Astrue*, No. 10 C 283, 2011 WL 904864, at *9 (N.D. Ill. March 14, 2011) ("The Seventh Circuit has not directly addressed whether a claimant's receipt of written materials that sets (*sic*) forth the necessary elements is sufficient to establish a claimant's knowing waiver."). A district court has held that these materials might suffice, provided the ALJ "establishe[d] at the hearing that the claimant received, read and understood the notices." *Seamon v. Barnhart*, No. 05 C 13 C, 2005 WL 1801406, at *10 (W.D. Wis. July 29, 2005); *see also Gatewood*, 2011 WL 904864, at *9 (citing the *Seamon* reasoning). *But see Dillard v. Barnhart*, No. 02 C 6251, 2003 WL 22478775, at *2 (N.D. Ill. Oct. 31, 2003) (holding that sending a pre-hearing letter did not relieve the ALJ of the hearing obligation to properly notify a claimant of the right to counsel).

However, in this case, the ALJ never mentioned written notices and did not establish that McCaster ever received, read, or understood any pre-hearing notices. The ALJ did provide McCaster a sheet of paper with legal aid organizations listed on the first page and bar associations listed on the second. (R. at 22–23.) But the hearing transcript provides no indication that these materials contained any

information about the role of an attorney in a disability determination hearing. For these reasons, McCaster's waiver of counsel was invalid.

**B. Development of a Full and Fair Record**

McCaster next argues that the ALJ failed to develop a full and fair record. (Dkt. 20 at 6.) In the Seventh Circuit, courts consider several factors when deciding whether a record has been "fully and fairly" developed. *Ferguson v. Barnhart*, 67 F. App'x 360, 367 (7th Cir. 2003). Some factors include (1) whether the ALJ obtained all of the claimant's medical records; (2) whether the ALJ elicited detailed testimony from the claimant at the hearing; and (3) whether the ALJ heard testimony from examining or treating physicians. *See id.* In the case of a *pro se* claimant, an ALJ fails to develop a full and fair record when there is a "significant omission." *See Nelms v. Astrue¸* 553 F.3d 1093, 1098 (7th Cir. 2009). An omission is significant if it is prejudicial. *Id.*; *see Nelson v. Apfel¸* 131 F.3d 1228, 1235 (7th Cir. 1997).

As noted above, in this case, the ALJ did not obtain a valid waiver of McCaster's right to representation. While such a failure does not, by itself, necessitate remand, it does heighten the ALJ's duty to develop the record. *See Skinner*, 478 F.3d at 841 (quoting *Smith v. Sec. of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)) ("When an ALJ fails to adequately inform an unrepresented claimant of the right to counsel, the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'").

In the case of a *valid* waiver, the claimant must show that the ALJ failed to elicit the relevant information. *See Nelms*, 553 F.3d at 1098 ("[A] claimant must set forth specific, relevant facts . . . that the ALJ did not consider."). However, in the case of an *invalid* waiver, the burden of demonstrating that the ALJ adequately developed the record shifts to the Commissioner. *See Binion*, 13 F.3d at 245.

In this case, the Commissioner has not established that the ALJ satisfied this heightened duty. First, we agree with McCaster that, during the hearing, the ALJ should have asked direct questions about the requirements of her past job as a phlebotomist. (Dkt. 20 at 9.) In his ultimate decision, the ALJ found that McCaster was able to perform her past relevant work "as actually performed." (R. at 16.) Prior to the hearing, McCaster had filled out several written forms that described the number of hours she spent completing various tasks at her old job. (R. at 114, 121, 270.)

However, McCaster's three accounts were inconsistent. In the first, undated account, McCaster stated that the job required her to walk/stand for 4 hours. (R. at 114.) In a second account, dated January 23, 2009, she stated that the job required her to walk/stand for 10.5 hours. (R. at 121.) In a third, dated October 27, 2009, she said that the job required her to stand/walk for 10 hours in a 12-hour day and stand/walk for 6 hours in an 8-hour day. (R. at 270.)

The ALJ briefly mentioned these inconsistencies in his decision and concluded that the third account was the "most recent." (R. at 16.) In determining that McCaster was capable of performing her past relevant work as actually

performed, the ALJ apparently put the most stock in this third job description, which ultimately aligned with McCaster's assessed RFC.[5]

Because of the ALJ's "heightened duty" to develop the record, the ALJ ought to have questioned McCaster about these different job requirements. Particularly notable, it is unclear whether McCaster worked 8-hour or 12-hour days. Assuming, *arguendo*, that the ALJ's RFC assessment was proper, the ability to work 6 hours in an 8-hour workday does not necessarily equate to the ability to work 10 or 10.5 hours in a longer day.

Of particular relevance, McCaster's testimony suggests that her ability to walk and stand was less robust than that described by the RFC assessment. McCaster testified that, after shopping for a mere *three* hours, she would lie in bed at night and experience "10" out of "10" pain. (R. at 35–36.) McCaster added that she would remain awake all night because of the pain. (R. at 36.) Yet, after McCaster revealed this information, the ALJ moved on to a new topic, neither asking any follow-up questions to illuminate McCaster's claims nor attempting to reconcile them with other evidence. In effect, McCaster was suggesting that shopping for a few hours could increase her pain from a "3" or "4" to a "10." It is unclear whether the ALJ ever considered this potentially important piece of evidence, as it was absent from his written opinion.

Regardless of which of McCaster's occupational summaries put forth the most accurate overview of her position as a phlebotomist, it is fair to say that the job

---

[5] The ALJ determined that McCaster had the RFC to stand/walk for 6 hours in an 8-hour workday. (R. at 12.)

required a considerable amount of standing and walking. With that in mind, McCaster's actual ability to stand and walk was a critical component of any inquiry into whether she was able to perform her past relevant work. *See also* Social Security Ruling (SSR)[6] 96-8p ("[T]he first consideration at . . . step [4] is whether the individual can do past relevant work as he or she actually performed it.").

In this case, the ALJ could have ordered a consultative examination to more fully and fairly develop the record. Specifically, such an examination could have uncovered the current state of McCaster's impairments. An ALJ is generally not required to order a consultative examination. *See Skinner*, 478 F.3d at 844 ("The ALJ is not *required* to order such examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient.") (emphasis in original). In this case, a consultative examination might have yielded clarifying information about McCaster's condition as of the hearing date. *See Nelms*, 553 F.3d at 1098 ("Although *pro se* litigants must furnish some medical evidence to support their claim . . . the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information.") (internal citations omitted).

---

[6] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

Finally, the ALJ's questioning of McCaster at the hearing was brief and perfunctory. The hearing lasted approximately 27 minutes and was recorded in fewer than 15 pages. (R. at 22–38.) McCaster's actual testimony was recorded in fewer than 12. (R. at 26–37.) In light of the omissions described above, the brevity of the hearing and the cursory questioning warrant remand.

While a hearing's length is not dispositive of whether the ALJ failed to satisfy her obligations, *Thompson*, 933 F.2d at 585–88, a perfunctory hearing may be indicative of such a failure, *see, e.g.*, *Nelms*, 553 F.3d at 1097–99 ("[During a 25–minute hearing] the ALJ did not probe, in any depth, [claimant's] recent past at the hearing or gather any medical evidence to fill the two-year gap in the record."); *Henderson v. Barnhart*, 205 F. Supp. 2d 999, 1010 (E.D. Wis. 2002) (finding that the Commissioner did not demonstrate a fully and fairly developed record where the hearing "was brief, almost perfunctory, lasting barely one-half hour"); *Harris v. Barnhart*, 219 F. Supp. 2d 966, 974 (E.D. Wis. 2001) (finding that the ALJ failed to fully and fairly develop the record during a 23–minute hearing); *Bailey v. Barnhart*, No. 01 C 1909, 2002 WL 31040350, at *14 (N.D. Ill. Sept. 12, 2002) (finding that the ALJ failed to develop the record at a claimant's hearing, which was transcribed onto a mere 11 pages).

For the above reasons, the Commissioner has not met her burden of showing that the ALJ fully and fairly developed the record. Accordingly, the Court remands this case to the Commissioner to develop the record, and it declines to address McCaster's other contentions. Nevertheless, on remand, the ALJ should reevaluate

McCaster's impairments and RFC, considering all of the evidence in the record, including McCaster's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rules. In particular, we urge the ALJ to heed the requirement that he build an "accurate and logical bridge from the evidence to his conclusion." *See Young*, 362 F.3d at 1002 (internal quotations and citation omitted). Furthermore, if McCaster appears at a subsequent hearing without representation, the ALJ shall obtain a valid waiver of representation.

## VI. CONCLUSION

For the reasons stated above, McCaster's Motion for Summary Judgment [20] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: May 23, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge